The first case on our docket is United States of America v. Bowen and others. Mr. Quaylen. Great to be with the court, counsel. Good morning, your honors. On behalf of Mr. Bowen, the first issue that I want to discuss is the failure of the trial court to give us a multiple conspiracy instruction. One, we requested it, and it was denied, and we did object to the charge, so I believe it is properly preserved for the court to consider. But we believe that the facts in the case clearly establish that a multiple conspiracy charge was appropriate in this case. The case law clearly says that as long as there's a scintilla of evidence or some evidence to support the jury charge, that it should be granted. And we believe it was error for the trial court not to give the multiple conspiracy charge. When one looks at the evidence in the case, there was clearly evidence suggesting multiple conspiracies throughout the trial. To me, it was a series of small conspiracies kind of combined into the government tried to present it as one single conspiracy. But as it related to Mr. Bowen, the evidence, depending on who you believe, the trial basically said that he began dealing with Mr. Perales at some time of September, October of that year. And that he was going to Mr. Perales and then coming and paying for his drugs in full. He wasn't being fronted them, so there was no – in our opinion, there was no evidence that he was in a conspiracy with Mr. Perales. It was simply a buyer-seller agreement, and then he went back to Sherman Dennison and engaged in his own activity. Later on, he then decided to work with Mr. Tibbs, and they drove down to Mr. Perales and received drugs as they pooled their money. We recognize that that was the testimony. But when they came back to Sherman Dennison, they went their own separate ways. The two of them were not dependent on one another. There was no evidence that they engaged in a conspiracy with one another. They were not sharing any proceeds. They did not have the same customers. They did not have any of the common factors that one looks at to show that they were in a conspiracy together. And I think that is the overriding issue the Court needs to look at, that there was evidence that Mr. Bowen was in a separate conspiracy as it related to everybody else, and the charge should have been given, and it was appropriate under the facts of the case. You concede – I take it that the jury could have found that this was part of an overall conspiracy. Your argument is that they could have found the opposite. Yeah, we believe they did, and that was part of the strategy of trial was to show that he was not part of the overall single conspiracy charge, and we believe the evidence had shown that he was part of his own separate conspiracy, and a jury could have found that if given the proper jury charge, but they weren't. And so that was at the – He did have a buyer-seller-distributor-distributee connection upstream to Salazar, albeit short, because I think Salazar went to prison shortly, quickly. And that's part – when you look at Salazar's activity and Mr. House, I mean they both were arrested and went to jail sometime in August of that year. And so when you break it down, they were no longer in part of the picture. They were out of the picture. They weren't continuing to distribute drugs at that time because they were incarcerated. And then other people went to another source, and then Mr. Bowen locked up with Mr. Tibbs. And so really you just have these individual groups of people engaging in their own individual maybe separate – definitely separate conspiracies, but they weren't interdependent upon each other. They weren't relying on each other to further the conspiracy. Didn't that dynamic relationship change that he would at times be part of an overall conspiracy and at times outside the conspiracy, and what do you do with that? Well, I think then that's why it's appropriate to give the multiple conspiracy instruction and let a jury decide that issue, especially if there's evidence in the record, which there clearly was in the case. Because when you broke it down by timeline, by series of events, they were all separate entities that the government tried to prove altogether by saying, well, because they may have used a common source, they were a conspiracy together. What point in time would you say that Bowen had departed from the overarching conspiracy and engaged in his own enterprise? It's our view that Mr. Bowen was never part of the original conspiracy charge because when you look at the way the testimony came through, that all of a sudden Mr. Bowen kind of pops up on the radar in sometime of September or October of that year. I understand that's your argument, but he could have been. He could have been. There's evidence, meaning in the sense that the jury could have so found and been sustained had they found it. If the evidence suggested that, they could have if he was in it some prior time. I understand that, but go ahead. And that will conclude my argument at this time. Thank you. May it please the Court and Counsel. I'm Franklin Mickelson, and I represent Mr. Salazar. I want to pick up a little bit on the multiple conspiracy instruction issue. What struck me was the lengthy analysis the district court or colloquy that occurred during the charge conference regarding this issue. And this line really stood out to me. The district court said, I never had a real clear picture of when to give a multiple conspiracy instruction. She then looked at the five-part test that is usually been cited in the Fifth Circuit. Excuse me for my cold. And it noted, you know, one is the time frame. Well, okay, what we basically have here is a four-year snapshot of the methamphetamine distribution process in this area of North Texas, Sherman-Denison. Location of events. Well, the supply is outside the Sherman-Denison area. It's going into the Sherman-Denison area. Persons acting as co-conspirators. Frankly, I'd never heard anybody analyze that, and I'll be honest, I don't know what it means. This is the statutory offense. Well, they're all charged with conspiracy to distribute methamphetamine. I'm not sure how that factor helps. Overt acts is another five-part test. Well, it's a drug case, and the government alleged no overt acts. So I think the court really didn't know what to do with that five-part test. The government . . . Judge Schell was the presiding judge. I'm sorry. Did I say Judge Krohn? I'm sorry. It's she. I was thinking Judge Krohn in my mind. I don't know. I'm sorry. But I'm sorry. I wasn't there. Well, I think that when you're talking about the judge's observations, you're talking about someone who's been on the bench for several years and has tried many of these cases. So it's in that context, I think, that you take that. As a district judge, I've had the same thoughts. I may have been a little more reticent. I sympathize, actually. I do think this is a confusing issue. The government distilled the test as follows. They said the defense must show a clear separation between what he is doing and what the others are doing. That was the government's test that they proposed. The court ended up really focusing on a Second Circuit case, the Maldonado-Rivera case. And then, basically, as far as I understood that test, it's like, are we talking about one network or two? And I think the reality here is . . . I'm going to just jump ahead. If we remove the illegal contraband out of this, and if you just imagine it was dairy products. You have a couple of dairies. We have more than one supplier supplying a couple of small towns in Texas. There's a couple of grocery stores. In the drug case, there would be distributors. And then they have workers. And then sometimes somebody goes to jail or goes out of business, and workers move from one grocery store to another. Or they open another one, and now they're competing with somebody they worked for in the past. And the question is, really what we have is a market dynamic. And the question is, is this whole nebulous thing one conspiracy? And really what I think the bottom line is, is it should have been a jury question. And the thought that occurred to me as I'm reading this long colloquy over this issue is, if it's this hard . . . But your argument is very strong, perhaps, as to Bowen, but I'm having difficulty with Salazar. Well, I think if it applies to Bowen, then it applies . . . I think . . . I've researched this and tried to understand it, but I think if you give . . . I don't think you can give a multiple jury instruction that applies to just some of the alleged . . . What's your position, that once he went to prison, he's no longer part of the conspiracy? I think that's a jury question. All right. What are the outer limits? When do you think the possibility of when he ceased to be part of the conspiracy is the first and ending dates? Well, he ceased to be part . . . He clearly was no longer part of the conspiracy when he quit distributing drugs. When he went to prison? Well, there was some evidence that he actually, for some period of time, had somebody distributing drugs for him, even from jail. But then it stopped. That didn't last very long. So, you know, my contention is that . . . Every time the government gets one of the leaders of a conspiracy and puts them in prison, then that ends that conspiracy and a new one starts. So that it matters whether you take players in and out. Every time you have a team member change, so to speak, you have a new conspiracy, is that your argument? I don't think . . . I think it's hard to say there was ever a single team. You have basically a market situation. Well, in these drug conspiracies, you have people coming in and out all the time. And I don't know that I've ever seen a case where all the players stayed the same throughout. And my only response to that is I think in these cases, unless it is clear, just clear, that it is just one conspiracy working together, they should just get the instruction and let the jury decide. So how many conspiracies there should have been charged? How many conspiracies should . . . What should the charge have looked like? I think the truth is . . . I see that I'm out of time, but I think the truth is . . . And the government could stand here with a straight face and they could have charged Salazar and House as a conspiracy. They could have charged the Perales . . . What did you ask? What was asked for in the district court? How many conspiracies did the defendants ask the court to charge? I think the only appropriate thing for the defense to do is ask for the multiple conspiracy instruction. I don't think they can ask . . . That's what the government charged. I'm sorry? That's what the government charged and it approved. Yes. And then they . . . So they simply just requested that there is an issue of multiple conspiracies for the jury to decide whether, in fact, there was one conspiracy or whether this consisted of two conspiracies, three conspiracies, or how many conspiracies. I'll return to my time. Thank you. May it please the Court, Counsel? In the sole issue of error, Mr. Juan Carlos Vega raises the issue of insufficiency of the evidence to establish a conspiracy to possess with intent to distribute methamphetamine. Is it the case that your client only had a relationship with Casares? That's correct, Your Honor. Casares, I believe, was the last witness in the trial. My client didn't know anyone until Mr. Casares took the stand. He . . . what the evidence established was that Mr. Vega had worked for Mr. Casares in the construction business for years. His relationship with Casares was that of an employee, and what was clear from the testimony of Mr. Casares is that he told my client, Mr. Vega, to do things, and he did them. But he knew they were illegal and they were drug-related. At some point, I believe that he gathered that knowledge. The question and the evidence never established that Mr. Vega and Mr. Casares had an agreement to possess with intent to distribute methamphetamine. The record is silent on what they attempted or what they intended to do with the drugs once they got them, that there ever was an agreement with respect to what each of their role would be, what proceeds, how they would be divided if they were. What does the record show that Vega did? You summarized it by saying that Casares would tell him what to do as an employer-employee relationship, but what actually was he doing? Was he hauling, transporting? What was he doing? Your Honor, the record establishes that at some points, Mr. Casares instructed Mr. Vega to go somewhere and pick up money, basically. He was picking up money, and I believe the record also establishes at another point he picked up drugs. What's unclear is to why on the one instance the main drugs that are involved, the six kilograms of methamphetamine, why they went separately if there was never an explanation as to why they weren't together when they went. Is there information that they also tried to cook the meth at one time together? There is, Your Honor. But if it was for Primo, does that tie it in? Your Honor, we don't know who Primo is. There was never a connection made to establish the identity of Primo. There was never an attempt by the government to link Primo to any of the other co-defendants in this case. And as you're well aware, Primo is a very common nickname for the first or the one in charge, which could be 100 Primos in Mexico. And the government wants us to believe that this Primo is connected with the other Primos in the case, but they never established through telephone records or anything that we're dealing with the same source of supply. But they weren't in a business just together, Vega and Casares. They were doing this for someone. The incredible evidence presented at trial was that Mr. Casares, in an effort to assist his girlfriend that he met in Mexico and protect her brother from being hurt by the cartel, did this as a favor and didn't even get paid for the first three or four transactions. Yes. The reality is under the law that you may be a small player, but you may join by your conduct a larger conspiracy, and then you become part of that conspiracy, and you pick up the liability that goes with it. Yes, Your Honor. But I think that the evidence is very clear in this case that as far as there being a larger conspiracy that my client was involved in, it was never established. The only thing that was established, and it's uncontroverted by the evidence, is there were three people. And perhaps that goes to this issue of multiple conspiracies. You're really arguing that your client, Vega, simply was unaware of the dimensions of the conspiracy, which I think has some foundation in the record. But my question is whether that takes you anywhere. He knows what he's doing is distributing drugs. He knows that you're picking up money and doing this activity, that there is a distribution of drugs that's going on. And there is therefore a conspiracy. He doesn't know its scope. So where does that take you? Well, Judge, I don't know that there is any evidence that they ever distributed anything. The evidence is . . . I thought he picked up money. At the point, correct. But on the issue of distribution of drugs, which they were charged with, the evidence is clear that instead of distributing it, they tried to cook it themselves. And then tried to get instruction on how to do it and failed in that attempt. And then shortly thereafter, both of them were arrested. So the government never made an attempt through their witness, Mr. Casares, to establish what they were going to do with the drugs after they perhaps were successful at cooking it. I see that my time is up. What would the quantity that . . . would the record show the quantity that Vega was connected to? Six kilograms, Your Honor. I'm sorry? Six kilograms. That's a little more than personal consumption. Yes, Your Honor. I reserve my time. Thank you. Good morning. May it please the Court. The evidence in this case established a single conspiracy to distribute methamphetamines for profit in the Sherman-Denison area. Is that really the question? It might establish one conspiracy, but could it have also established more than one? What could the jury have found if it's so instructive? Well, possibly going first to your question about if . . . could the evidence have established more than one conspiracy? We don't think that it did, but if it did, there was no variance because the government proved that each defendant was a part of the conspiracy, and I would like . . . . . . in a situation where they couldn't have found anything else. The risk of not giving an instruction is that you'll be right where you are now, that there is evidence from what the jury could have. So I put it to you that you can't sustain, at least as to, I think, Bowen here, unless you can demonstrate that there simply was no evidence but that. There was a large conspiracy. In other words, the jury could not have done so. I think that . . . And that's the answer to the judge's question. It's the jury question. What you were describing is the essence of a problem that's very difficult to sort out from the bench in some singular reasoned way, and it goes to the heart of what goes to the jury. And that didn't happen here. And I think here, Judge, Judge Schell took two and a half hours to examine the law and to think about the evidence that he heard. And after he did that, he concluded that there was too much interdependence, too much overlapping of all the participants, and the Fifth Circuit has . . . Okay. I understand that conclusion, but let's look at it for a moment. I thought that Timothy Bowen had an employer-employer relationship with TIBS. He had a buyer-seller relationship briefly with Kay Bowen. I guess that's . . . I don't know how to pronounce her name. But at best, Timothy Bowen was at the bottom of his chain. But here's what happened, Judge. Let's focus on Kenneth Howells and Renee Salazar. They were partners. They were getting methamphetamine from two different sources that originated in Mexico. First, Primo, who sold methamphetamine to Andy Nguyen, who sold methamphetamine to Mike Camacho, who then sold methamphetamine to Partners House and Salazar. On the other side, we have Pelon, who was in Mexico, who sold methamphetamine to Fernando Perales, who went by the name Dog, who sold methamphetamine to House and Salazar. Now, House and Salazar had their own customers, and one of Salazar's customers was Timothy Bowen. Now, Timothy Bowen bought methamphetamine from Salazar, and his brother Melvin did, too. Mr. Salazar fronted methamphetamine. He bought from Perales, as well. That's right. That was my next point. When Salazar was in prison, then Mr. Bowen was introduced to Dog, to Perales, and began buying methamphetamine directly from Perales. So it is one conspiracy. Well, it kind of depends on where you draw the lines. I mean, if you look at House and Salazar as a sort of center, with Perales and Camacho as suppliers, but then once you take Salazar and House out of it, and Perales is a supplier, isn't that a different conspiracy? I mean, you've got a lot of common players. They're common players, and they overlap. They're interdependent on each other. Well, how is Perales dependent on Camacho? Perales was dependent on Camacho because he was buying methamphetamine from Camacho. In fact, Perales, I'm sorry, Perales. On which one, I'm sorry? Perales. I thought it was Perales. Oh, Perales. Salazar was buying methamphetamine. Then Salazar, I thought you said Salazar and House went out of the picture, and then Bowen started buying directly from Perales. That's true. And so that's a different supplier than the primo-Camacho chain, and there's no involvement of House and Salazar. But I think we need to focus. One thing that I've seen lacking in this discussion is that this court has upheld not giving the jury the multiple conspiracy instruction if the defendant did not argue and the evidence did not prove that the defendant was only involved in a separate non-charged conspiracy and not in the overall conspiracy charged. So if you look at the Castaneda-Cantu case and the Asbor case, in both of those cases, the Fifth Circuit said that there was not evidence of that, that the defendant was part of a separate conspiracy unrelated to the one charged in the indictment. Is it your position that if they could be in both a separate and also a multiple, that it's not error to refuse to give the instruction under Castaneda-Cantu? That's your position, that if you could be in both and not just only, that our precedent says that it's not error? Is that what you're saying right now? Yes, ma'am. Okay. What if it was error? I don't see that you argued that this was harmless. So if it's error, we reverse, right? Hold on just a moment. I don't think so. But you didn't brief the harmless error and say, oh, it's so overwhelming and for some other reason it doesn't matter. You didn't brief that, did you? Did you? To all of them? Or maybe you don't. I'm sorry. That's my question. What result if it was error? I think I would have to do some additional research then and file a supplemental after the argument. One possible outcome in this is because it may be that only as to Bowen is there a possibility of multiple conspiracies. But I suggest to you that the driver in these cases is really something you haven't talked about. It's joinder. The government, the real practical limitation upon the prosecution of these cases is what we're talking about now. That is that you can take a, you've got a local community that's dealing in a lot of drugs. The drugs are going around and forth. There's several dealers.  You can go at it one of two ways. You can charge separately and then you've got separate trials because you cannot get a severance with that overarching charge. When the government knows when it files that conspiracy charge overarching, that kills any possibility of separate trials. So now the defendant is put to trial. Bowen's put to trial with other people who are much more heavily involved in the dealing with drugs. That's an efficient way of doing it. But then when you get to the end of the line, you have to take the deal with whether you can really prove the basis of joinder. So it's not just a matter of a technical problem. It goes to the heart of what the government is doing in sweeping up the drugs. I'm not critical of that. That's a practical problem that is made. But that is the judgment call that's made. Do you agree with that? Yes, sir. Okay. And in this case, there were 34 defendants, and Mr. Bowen was one of the defendants who started buying methamphetamine from Mr. Salazar. But he also bought directly from Perales. So, again, he was part of the conspiracy in one way. He was living up in the conspiracy when Mr. Salazar went to jail. What was the worst thing he had done at the point at which Salazar stopped distributing? At the point? Buying and selling methamphetamines. I think that was the worst thing that the government proved. And he sold to? All we know is that— While Salazar was still dealing. He had a good customer base because that is why Christina House and Timothy Bowen's sister-in-law, Keisha Bowen, agreed to introduce him to Perales. So, he had a good customer base. That's what we know. And as far as Salazar and House being out of the conspiracy after they went to jail, they weren't. As Mr. Mickelson referenced, Mr. Salazar had other people, Charles Chiarolo specifically, who sold methamphetamines for him when he went to jail until Chiarolo messed up. And Salazar's customers then went directly to Mr. Perales. And back to Mr. Vega, the government did prove the connection to Primo. Because in this case, when Primo was distributing the methamphetamines, selling it to Andy Nguyen, he used runners to bring the methamphetamines in from Mexico. Those runners met up with Cazares and Vega. And once they had the methamphetamines, they met up with Mr. Nguyen's runners. So, I believe it was Manuel Urbina who testified, excuse me, that he picked up methamphetamines from the man in the silver truck. And that man was Cazares. So, the evidence was there that the drugs that Cazares was picking up was related to the Primo who was distributing methamphetamines to Andy Nguyen. What is the government's position about whether it would be improper bolstering to talk about debriefing? And if these comments were, in fact, about debriefing rather than about perjury and the ability to seek that, do you believe that was a proper closing argument? We've had a whole series of cases instructing the U.S. Attorney's Office regarding improper closing arguments. Do you believe, as an officer of this Court, that that is proper to talk about debriefing if debriefing is not an evidence? I'm not asking whether or not you said in your brief that you didn't think it was about debriefing. But if it were, in fact, about debriefing and not about perjury after the fact, was that a proper closing argument? If it was about debriefing, it could have been a reasonable response to Mr. Whalen's very detailed closing argument that was attacking the credibility of the witnesses. But even if it was not a proper comment because this is a plain error analysis, then we think that the Court should keep in mind those three prongs required to reverse the case. But part of what we do is, and we might agree with you about plain error, but part of what we do is we help instruct for future conduct and that sort of thing. And so are you saying that it's proper to rely on things outside of evidence in closing argument if it somehow rebuts something that the other side says in closing argument? Well, not outside of the evidence. Okay. And debriefing was not inside the evidence, was it? There were questions posed to the witnesses about did you meet with the government and how often and how many times. I don't recall any specific instance where the defense went into the specifics. I have seen it done in other trials where the defense will say, but you didn't tell the government that when you debriefed. Right, but that wasn't this situation. I don't believe it was. So it wouldn't be proper to go into the details of debriefing in closing argument. Well, overall, I would agree with you, but I'm not sure that that's what he did. What was the objection? Never. What objection did counsel make at the time? None. We're here on plain error. Yes, sir. The fourth prong, the last prong of plain error analysis, whether this renders a fundamental injustice system. And that's the context in which you answered the question of responsive to another. That's right, Your Honor. Because we often are here on plain error because no one objects in closing argument, we've given a whole series of guidance and a whole series of opinions, Aguilar and others, that have said stop doing this, stop doing this, stop doing this. Yes, ma'am. But Aguilar was substantially different because the government was seeking to bolster law enforcement witnesses. And in that case, the defense had presented plausible explanations for what they did. That's not this case. This was a remark by the prosecutor that took less than a minute or about a minute in a one-and-a-half-week trial. And keep in mind what the prosecutor was doing. He was specifically trying to compare, to get the jury to compare testimony between witnesses. The court had given the instruction that when you assess credibility, one of the things that you can do is to compare witness testimony. Judge Shell also gave the instruction that the credibility of the witnesses is your sole decision and that what the witnesses say is not evidence. And not only that, the prosecutor urged the jury to follow the court's instructions. Witnesses say it's not evidence. I'm sorry. You meant lawyers, I think. Oh, yes. I'm trying to follow what you said. You're right. I'm sorry. It's okay. I misspoke. That what the lawyers say is not evidence. So this case is far different from Aguilar. I'm not saying that it means it needs to be reversed. I'm asking what the government's belief is about its professional responsibility. And I think you've answered the question. Thank you. Okay. Thank you. If there aren't any further questions, then that's been done. Thank you. On behalf of Mr. Bowen, just a couple of comments in rebuttal. Judge Owen, you had talked about what proposed charge that we had asked for. And the charge I simply asked for was the Fifth Circuit pattern jury charge that we had filed requesting that instruction. So we didn't specifically say, you know, what conspiracies do you find? We simply requested the Fifth Pattern jury instruction in that regard. And also, as it relates to the issue about interdependent players, the case law clearly shows that people can come and go from a conspiracy and all that stuff. But when you look at House and Salazar in this particular case, I mean, they were major players at the top. And once they're out of the picture, then I think the evidence clearly showed that then it starts all over again and there's new agreements made with people. What if there's evidence that Bowen participated in both? Well, as it relates to Bowen participating in both, I think there's one testimony from one witness that, oh, yeah, Timothy was getting drugs from Mr. Salazar. But then the question becomes, and I thought about that, is that creates a whole other set of issues because then is then Mr. Bowen's conduct with Mr. Perales part of the charge conspiracy or not? And then does that relate to some 404B issue that needed to be addressed separately because which conspiracy did they find him guilty of? But if he participated in both, does Castaneda-Cantu say that it's not an only situation and therefore it's not error? Well, the way we approached the case and what we believe the evidence clearly showed and the majority of the evidence the government had was that he was involved with Perales and he wasn't part of that conspiracy because when you looked at the testimony of all the different witnesses as related to Bowen, they all contradicted each other. Everyone said, oh, he did this, he did that. No one was consistent necessarily in what he said. But if it was both, if the evidence shows both, is it reversible error not to give the instruction? I think it's reversible error because the evidence supported the instruction and the case law shows that if there's evidence to support it or even a scintilla of evidence that it should be given, I think it's error that it wasn't given under the facts of this case. But doesn't Castaneda-Cantu say that it's only error if it only shows the separate conspiracy and not the single? Uncharged. Uncharged, yeah. Uncharged. I'm trying to figure out if it's error. It might have been better practice, but is it reversible error? Our position is it's error because I think there's potential for a jury to find a possible different,  It's a defensive theory that we argue. But if both conspiracies were charged, maybe improperly as a single one, but if they were both charged and there's evidence that he participated in both, what is the error? Because it then doesn't allow the jury to, the way I would say it is you never know what the jury found him guilty of. They may have said he's not part of the first, but he was part of the second. Part of the second, and then you'll never know whether or not how they parsed it out and whether they found the evidence was beyond a reasonable doubt. I think that's where the trouble becomes because now you What did the indictment charge? What did the indictment charge? The indictment said beginning on or about I think January 2008 up until April 2012 that those 34 people participated in a conspiracy to distribute methamphetamine and so it covered that entire time frame. Perales was named. Perales was named in that time frame. But it also was interesting, Judge Higginbotham, you mentioned about charging these separately. Mr. House, who testified at trial, and Mr. James, they were charged separately in a separate indictment. That's all I have. Thank you, Your Honors. And I would like to pick up with, I think the government clearly enjoys the prerogative. They could have taken these 34 people over this period of time and made various conspiracy charges. Or, if they choose, they can group them all into one large conspiracy charge like they did. But if they do, I think it is not unreasonable that they should have to have a multiple conspiracy instruction. And the jury can consider whether it is in fact one conspiracy or multiple conspiracies. I think it's interesting, an interesting question arose because in my mind, because House and Salazar are more central in this sort of home market situation that you had in the Sherman-Denison area. But the question to me is, in a conspiracy case, if the multiple conspiracy charge is warranted, it applies to all the defendants in the conspiracy case. I'm not sure that's true. I looked at Irwi, trying to determine that. And it seemed that that's what happened in Irwi. That in Irwi, we had two brothers, one operating in Tyler, one operating in South Dallas, operating an appeal distribution network in the same manner, with these fortified apartments. The Tyler brother was often supplying the South Dallas brother. The South Dallas brother's workers often went to go work for the Tyler brother. And yet, this court said it was error not to give a multiple conspiracy instruction and reversed everybody's convictions under the conspiracy count. I just don't see how that can be true. Let's suppose House and Salazar had never been arrested, were partners, and House decided to take his money and go his own way, and Salazar continued the business. I don't think that starts a new conspiracy. Salazar has a conspiracy from beginning to end with his whole stream. Just because one of his partners decides to leave doesn't change Salazar's overarching conspiracy. That's a hypothetical, not what happened here. So House might be entitled to multiple conspiracy charges, but I don't see how Salazar would under that hypothetical. I think it is a question of whether the government has proven one overarching conspiracy. And if there are multiple conspiracies, they haven't proven that. And that is the fact question that the jury was entitled to decide in this case. Thank you. Briefly. One overarching conspiracy, but then you have one defendant who's connected in such a way that a jury could find that he was never part of that. Or is it the case that if you have an overarching conspiracy that any act that furthers that conspiracy brings that individual within the compass of the overarching conspiracy to the exclusion of a contrary finding? In other words, the jury's going to have to find up or down if it was a conspiracy or not a conspiracy, and that's the end of it. And everybody's in or everybody's out. Your Honor, with respect to my client, of course that argument could be made and he was brought in at the very end of this conspiracy. I think the last week of this conspiracy. Your argument's really, my question to you is really unfair. I apologize for that. Your client's really in. The question is whether he joined at all. Yours was insufficient of the evidence. Yes, Your Honor. I understand. And the government's response to the argument was that at some point other people in this conspiracy met someone with a silver truck. And what is not clear, and the evidence never showed, was that at what point did that happen? Did it happen three or four of the prior times Mr. Kaceres was already involved and had not involved my client because he didn't involve him until the very end as he testified to, at which point my client wasn't a member of any conspiracy. Thank you.